Robert B. Sykes (#3180)
C. Peter Sorensen (#16728)
Christina D. Isom (#17244)
**SYKES MCALLISTER LAW OFFICES, PLLC**
311 S. State Street, Suite 240
Salt Lake City, Utah 84111
Telephone No. (801) 533-0222
bob@sykesmcallisterlaw.com
pete@sykesmcallisterlaw.com
christina@sykesmcallisterlaw.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| Estate of BRYAN PENA VALENCIA, by and through MARIO HERRERA and ANA HERRERA, Co-Personal Representatives, <br><br> Plaintiff, <br><br> vs. <br><br> OMAR FLORES and SHANE SCRIVNER, Unified Police Department Officers; UNIFIED POLICE DEPARTMENT OF GREATER SALT LAKE (UPD); and JOHN AND JANE DOES 1-10, <br><br> Defendants. | **COMPLAINT & Jury Demand** <br><br><br> Civil No. _____ <br><br><br> Judge _____ |

      The Estate of Bryan Pena Valencia (Bryan), by and through Mario Herrera and Ana Herrera, through counsel, complains against Defendants as follows:

## <u>PRELIMINARY STATEMENT</u>

      This is a civil rights action in which Plaintiffs seek relief for Defendants' violation of Bryan Pena Valencia's rights guaranteed by the United States

1

Constitution, specifically the Fourth, Fifth and Fourteenth Amendments. These rights are further secured by the Civil Rights Act of 1871, codified as 42 U.S.C. §1983 and § 1988, and by the laws and the Constitution of the State of Utah. Plaintiffs seek compensatory and punitive damages; affirmative and equitable relief; an award of attorney fees, costs, and interest; and other and further relief as this Court deems just and equitable. This action also arises under the constitution, laws, and statutes of the State of Utah.

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and federal law, particularly under the provisions of the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States, and 42 U.S.C. §§ 1983, 1985 and 1988.

2.      This action seeks redress for violations of the civil rights laws of the United States, and jurisdiction is therefore invoked pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

3.      This action also seeks redress for violations of Plaintiffs' constitutional rights secured by the Utah Constitution, specifically, Article I, §14, which provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, particularly describing the place to be searched, and the person or thing to be seized.

4.      This action is also brought under Article I, §9, unnecessary rigor, which reads:

Persons arrested or imprisoned shall not be treated with unnecessary rigor. These provisions of the Utah Constitution are self-executing and do not require notice under the Governmental Immunity Act.  This Court further has pendent jurisdiction over any and all State claims.

5.      The claims made in this Complaint occurred and arose in the State of Utah, in this District. Venue is therefore proper under 28 U.S.C. § 1391(b).

6.      Plaintiffs are seeking damages pursuant to the claims for relief specified below in amounts to be proved at trial, but not less than $2,000,000.

7.      This Court therefore has jurisdiction for trial of the above-captioned matter.

8.      The Estate of Bryan Pena Valencia is a Plaintiff herein, representing the interests of Bryan under the laws of the State of Utah. The Estate is represented by Ana Herrera and Mario Herrera, both cousins, seeking compensation for Bryan's 11-year-old child, Minor Roe.

## **PARTIES**

9.      Plaintiff **Ana Herrera ("Ana")** is a citizen of the United States and a resident of West Valley City, State of Utah. Ana is a cousin of Bryan Pena Valencia, deceased. On May 3, 2021, Ana petitioned the Utah state court to be appointed the co-personal representative of the Estate of Bryan Pena Valencia.

10.     Plaintiff **Mario Herrera ("Mario")** is a citizen of the United States and resides in West Valley City, State of Utah. Mario is a cousin of Bryan Pena Valencia, deceased. On May 3, 2021, Mario petitioned the Utah state court to be appointed the co-personal representative of the Estate of Bryan Pena Valencia.

11.     Defendant **Unified Police Department (UPD) of Greater Salt Lake** is a police department authorized to operate by the State of Utah and organized as a special district under an interlocal agreement comprising multiple communities in Salt Lake County.  UPD employed Omar Flores and Shane Scrivner and several officers who are currently designated Does 1-10.  UPD is a "person" within the meaning of 42 U.S.C. §1983.  Officers Flores and Scrivner and Does 1-10 were at all times "state actors."

12.     Defendant **Officer Omar Flores ("Flores")** is sued in his official and individual capacities. At all relevant times, Flores was a police officer working with the UPD. Flores had an active role in the events which caused the death of Bryan and which caused injuries, damage and loss to his Estate. At all relevant times, he was acting within the course and scope of his employment with UPD, and pursuant to UPD policies. Flores improperly and unconstitutionally used deadly force against Bryan.

13.     Defendant **Officer Shane Scrivner ("Scrivner")** is sued in his official and individual capacities. At all relevant times, Scrivner was a police officer working with the UPD. Scrivner had an active role in the events which caused the death of Bryan Pena Valencia and which caused injuries damage and loss to the Estate. At all

4

relevant times, he was acting within the course and scope of his employment with UPD, and pursuant to UPD policies. Scrivner improperly and unconstitutionally used deadly force against Bryan.

14.    Defendants **John and Jane Does 1-10 ("Does 1-10")** are sued in their official and individual capacities. John and Jane Does 1-10 were responsible for the supervision and/or training of Flores and Scrivner.  Each Doe had an active role in the events which caused the death of Bryan and which caused injuries and damage to the Estate. At all relevant times, each Doe was acting within the course and scope of his or her employment with UPD, and pursuant to UPD policies. Does 1-10 are believed to have been complicit or involved when Flores and Scrivner improperly and unconstitutionally used or contributed to the use of deadly force against Bryan.

15.    UPD made and enforced policies, practices and procedures for its employee police officers, and for Flores, Scrivner, and Does 1-10.

## FACTUAL ALLEGATIONS

16.    The incident that precipitated this complaint occurred on March 21, 2020.

17.    Early in the morning, UPD dispatchers received two calls from individuals reporting to have heard gunshots in the area of 6200 South in Salt Lake County. "*Letter – Summary of Facts and Findings*," March 5, 2021, Sim Gill, p. 5.

18.      Flores and Scrivner with two other Doe UPD officers responded to the call.  *Id.*

19.      UPD Dispatch sent out an ATL (Attempt to Locate) for a "darked out vehicle, possibly a truck."  *Id.,* p.11.

20.      The ATL was broadcast with the report of the gunshots.

21.      Scrivner reported that "darked out" meant traveling at night without headlights or running lights.  *Id.*, p. 11.

22.      As they searched, Flores and Scrivner followed a truck for a short time and then went on their way to investigate someone they believed might have been involved with the reported gunshots.  *Id.*, p. 11

23.      While on their way to investigate the potential suspect, they saw a dark colored Cadillac in the parking lot of a nearby park.

24.      Flores and Scrivner decided to investigate.  *Id.,* p. 5.

25.      Bryan was in the Cadillac.

26.      Bryan had just left his girlfriend's house and had stopped at the park on his way back to the house of Ana Herrera.

27.      Bryan was Hispanic.

28.      Ana and Mario are Bryan's cousins.

29.      Bryan was living at Ana's home during the relevant time with his minor son, Minor Roe.

30.      When the Officers entered the park, Bryan started the engine on his Cadillac and started to leave.  *Id.*, p. 11.

31.      Scrivner noticed that Bryan's right taillight was not working properly. He also observed that Bryan was in the park after hours.

32.      Scrivner felt he could engage in a traffic stop based on these two violations.  *Id.*, p. 11.

33.      Scrivner turned on his overhead lights, but Bryan did not stop.

34.      Scrivner then turned off his lights and discontinued the pursuit.  *Id.*, p. 11.

35.      As Scrivner ended his pursuit, Flores sped up and went around Scrivner on 6200 South and continued to follow Bryan on 6200 South approaching 3200 West.

36.      Flores did not turn on his lights or siren.  *Id.*, p. 6.

37.      During the process of making the turn onto 3200 West from 6200 South, Bryan reportedly crashed his vehicle.

38.      Bryan left the vehicle and began walking away from the vehicle.  *Id.*

39.      Scrivner reported that he heard over his vehicle radio that the Cadillac Bryan was driving was not stolen.  *Id.*, p. 12.

40.      One of the other Doe UPD officers had reportedly been following a "blacked out Dodge truck."  *Id*, p. 6.

7

41.      The Cadillac, according to Scrivner 's description, was not "blacked-out." Except for the right rear tail-light, its lights were on and functioning.

42.      The Officers knew the Cadillac was "completely unrelated" to the gunshots which had been reported earlier to Dispatch. *Id.*

43.      When Flores turned onto 3200 West, he saw a crashed vehicle.

44.      Flores saw that the car door was open and that no-one was in the car.

45.      Flores did not see the car crash.

46.      As Flores continued down the street in his vehicle, he saw Bryan on foot.

47.      Flores stopped his vehicle and began to pursue Bryan on foot.

48.      Flores radioed dispatch that he was chasing a man on foot running away from a car that had crashed. *Id.,* p. 8.

49.      Flores was wearing a functioning body camera as he chased Bryan.

50.      Flores reports that he saw Bryan start to climb a fence. He reported that he yelled "Police!" and "Stop!" *Id.,* p. 9.

51.      Bryan allegedly continued to climb the fence.

52.      Flores reportedly followed him over the fence into a dimly lit, small residential backyard. *Id.*

53.      Once over the fence, Flores reported that he drew his Taser and yelled: "Stop running or you will be Tased." *Id.*

54.     Flores reported that Bryan responded to him saying "Okay," but did not stop. *Id.*

55.     Flores reported that he continued to follow Bryan, yelling "Stop and get on the ground." *Id.*

56.     Bryan, according to Flores, reached the gate at the end of the yard and started to climb the gate.

57.     At that point, Bryan stopped and told Flores, "Okay, Okay I give up." *Id.*

58.     After saying "Okay, Okay, I give up," Bryan turned and faced Flores.

59.     Bryan made no threatening moves toward Flores. *Id.,* p. 9.

60.     According to Flores, Bryan continued to climb the gate.

61.     Flores reportedly fired his Taser twice, but it appeared to have no effect on Bryan.

62.     Flores yelled for Bryan to, "Get on the ground!" *Id.*

63.     Flores threw his Taser on the ground and drew his handgun, pointing it at Bryan. *Id.*

64.     According to his report, Flores gave Bryan the verbal command to, "Put your hands in the air!" *Id.*

65.     Bryan answered Flores's command by saying, "Okay," *Id.*

66.     Bryan then put his hands in the air near the sides of his head. *Id.*

67.     After stopping his vehicle behind the crashed Cadillac, Scrivner followed after Flores and arrived moments later on the scene.  *Id.*, p. 10.

68.     Flores alleged that Bryan continued "motioning toward his waistband" of his hoodie.  *Id.*

69.     Bryan put his hand in the pocket of his hoodie, and it got stuck for a moment.  *Id.*

70.     Flores reportedly ordered Bryan to take his hand out of his pocket or he would be shot.  *Id.*

71.     Bryan immediately complied saying, "okay, okay, okay …"  *Id.*

72.     Bryan then removed his wallet from the pocket and threw it over the fence.  *Id.*

73.     Bryan had no weapon in his hands or on his person and had made no threats to Flores.  *Id.* pp. 9-10.

74.     Upon arriving, Scrivner immediately drew his handgun and pointed it at Bryan.  *Id.*, p. 12.

75.     Scrivner took a position at 90 degrees from Flores and Bryan.  *Id.*, p. 12.

76.     Scrivner immediately started yelling for Bryan to, "Show me your hands.  Show me your hands."  *Id.*, p. 7.

77.     As Scrivner started yelling at Bryan, Flores reported Bryan turned his attention to Scrivner as he had been ordered to do.  *Id.*

78.     As Flores continued yelling, he noticed that Bryan turned his attention from Scrivner back to him.

79.     Flores claims to have believed Bryan was lowering his hands, again reaching for his hoodie pocket.

80.      With his gun already in his hands, Flores allegedly yelled, "Do not f------ reach, I will f------ shoot you!"  *Id.,* p. 10.

81.     Scrivner described the encounter with Bryan as a "high risk stop."

82.     Scrivner never provided any supporting facts as to why this was allegedly a "high risk stop." *Id.*, pp. 13-14.

83.      At most, Bryan may have committed a misdemeanor.

84.     Bryan did not have a weapon.

85.     He had made no threatening moves toward the Officers and had not made any verbal threats.

86.     He had complied with all commands that he was given.

87.     He had stopped running.

88.     He had been cornered in the back yard against the fence.

89.      Bryan told the Officers, "Okay, Okay, I give up." *Id.,* p. 9.

90.     The two Officers were yelling conflicting directions of "show me your hands," "drop to your knees," "put your hands in the air," "get on the ground" and "you will be shot." *Id.,* pp. 7, 9, 10, 12, 13.

91.      Flores and Scrivner were also yelling commands at each other which added to the confusion. *Id.*, p. 13.

92.     The totality of the officers' actions made the scene very chaotic.

93.     Bryan was confused, frightened and afraid of what the Officers might do to him, especially since both Officers had their guns drawn and pointed at him.

94.     Bryan was terrified and froze.

95.     According to the Scrivner, Bryan appeared to be going through a thought process, to be making a decision. *Id.*

96.     In response to Flores's threats to shoot him, Scrivner reported that Bryan said, "Chill out, or calm down, bro, or something like that." *Id.*, p. 13.

97.     Flores reported that Bryan said, in response to threats to shoot him, "Okay … calm down, okay …" *Id.,* p. 10.

98.     Scrivner reported that he could see both of Bryan's hands.  He did not report seeing a weapon of any kind in Bryan's hands. *Id.,* p. 13.

99.     Contrary to other reports, Flores reported that he did not subjectively believe Bryan was complying with his commands. *Id.*, p. 10.

100.     Flores reported that he believed Bryan was a threat to Scrivner and to others in the neighborhood because he was allegedly reaching for his waistband.  *Id.*

101.     Flores reported that he believed Bryan might have a weapon and could use it to shoot at him.  *Id.*

102.     Based on these unreasonable and fully subjective beliefs, Flores then proceeded to shoot Bryan from an estimated distance of ten to twenty feet.  *Id.,* pp. 7, 10, 13.

103.     Scrivner reported that, after being shot, Bryan "instantly" dropped and fell to the ground. *Id.,* p. 13

104.     According to Scrivner, after being shot, Bryan looked up and made eye contact.  *Id.*, p. 13.

105.     Flores continued shooting even after Bryan had fallen to the ground firing a total of six shots at Bryan, five after Bryan was on the ground.

106.     Other officers attempted to provide first aid, but Bryan died from Flores's six gunshot wounds.  *Id.* p. 7, 10, 13.

107.     On March 5, 2021, District Attorney Sim Gill ruled,

> Officer Flores used deadly force to prevent Mr. Valencia, not from drawing or producing a gun, but to stop Mr. Flores (sic: "Mr. Valencia") from <u>reaching</u> <u>for</u> – what Officer Flores said he believed – was a gun.  Although Officer Flores articulated the totality of the circumstances that combined to cause him to believe Mr. Valencia's actions were intended and designed to do one thing – produce a gun – we're not persuaded that these circumstances were

> sufficient to make Officer Flores' belief reasonable.  Therefore, we cannot conclude Officer Flores' use of deadly force was justified."

*Id.*, p. 18 (emphasis in original).

108.     Fleeing the scene of an accident is a minor misdemeanor offense in Utah.

109.     Flores was wearing his complete police uniform.

110.     Scrivner was wearing his complete police uniform.

111.     Bryan was completely compliant and not resisting this initial detention or being aggressive in any way.

112.     Some of the events described herein are captured on Flores body cam, until Flores intentionally turned it off or dropped it to spoil evidence.

113.     Scrivner also reportedly was not wearing a body camera.

114.     Flores unnecessarily chased Bryan in the back yard.

115.     Once in the backyard and backed up against the fence, Bryan was no longer fleeing.

116.     By chasing Bryan unnecessarily, Flores, through his own deliberate and reckless conduct, escalated a non-lethal situation into a lethal one in which he wrongfully used deadly force.

117.     Flores' shooting was an assault with a deadly weapon.

118.     Flores' use of force against Bryan was completely unjustified.

119.     Scrivner contributed to the unjustified use of deadly force through his own deliberate and reckless conduct, which included drawing his gun and, with Flores, escalating a non-lethal situation into a lethal one.

120.     Bryan was at all times unarmed. He never had a weapon of any kind.

121.     Bryan had never threatened Flores or Scrivner or anyone else.

122.     Bryan had not taken any violent action against Flores or Scrivner or anyone else.

123.     Bryan at no time posed a threat to Flores or Scrivner or anyone else, such that deadly force was needed to force him into compliance.

124.     It was a violation of Bryan's rights for Flores or Scrivner to administer punishment for running a short distance before he was apprehended.

125.     Before the pursuit began, Flores and Scrivner knew the vehicle Bryan was previously operating had not been stolen and was not the darked-out vehicle being sought by police.

126.     Bryan had multiple gunshot wounds throughout his body.

127.     Bryan was killed as a result of the unconstitutional use of excessive force.

128.     Ana and Mario have been robbed of the association and relationship with Bryan.

129.     Bryan's 11-year-old-son has been left without a father.

15

130.     The shooting of Bryan in this case constituted the unnecessary use of deadly force.

### FIRST CAUSE OF ACTION

### ~ *Unlawful Seizure* ~

*Violation of the Fourth Amendment against Flores and Scrivner, in their individual capacities.  Cognizable under 42 U.S.C. §1983.*

131.     Plaintiffs incorporate all other paragraphs herein.

132.     There was no reason to chase or detain Bryan.

133.     Bryan had committed no serious crime in the park.  At the very most, 1) he was in the parking lot of a park after hours; and, 2) he had a non-working right rear tail-light.   Under Utah law, these could be construed as very minor misdemeanors or infractions.

134.     There was no evidence or information that would justify any suspicion by the Officers that the Cadillac in the parking lot was the "truck" involved with the shots that had been reported earlier to Dispatch.

135.     After Scrivner had discontinued his pursuit based on the alleged traffic and park violations, there was no reason for Flores to pass Scrivner and continue following Bryan.

136.     Further, Flores had no reason, when he found the crashed car, to continue the foot pursuit.

137.     All Officers knew the car had not been stolen. Additionally, they knew the car was not the suspect "truck" they were trying to locate and identify.

138.     At most, after the crash, Flores could justifiably pursue Bryan for having fled the scene of an accident, which is a misdemeanor.

139.     However, because Flores arrived after the crash, he did not have evidence to even support this possible justification because he did not possess the knowledge that any such possible crime had been committed.

140.     There was no reason for Flores to continue chasing Bryan into the backyard of a private residence because of a possible misdemeanor allegation.

141.     Flores could have quickly identified Bryan simply by checking the license plates on the Cadillac against the State DMV database.

142.     Bryan, allegedly, did not immediately obey Flores's command to stop.

143.     However, he soon complied, came to a stop and faced Flores.

144.     Bryan put his hands in the air and said, "Okay, Okay, I give up."

145.     At that point, Bryan was formally seized by the Officers for what was, at most, a minor misdemeanor.

146.     Bryan was not a threat to either of the Officers or anyone else in the neighborhood.

147.     Bryan had made no verbal threats to the Officers.

148.     Bryan had made no aggressive moves toward the Officers.

149.     Bryan did not have a weapon in his hands or on his person.

150.     The seizure of Bryan was not reasonable under the circumstances.

151.     There was no probable cause for Flores to continue his pursuit and to "corner" Bryan, threatening him with his gun drawn.

152.     He recklessly, deliberately, and needlessly escalated a possible minor misdemeanor or infraction into an illegal seizure and an illegal use of deadly force.

153.     There was no probable cause for Scrivner to draw his handgun and point it at Bryan.  He was simply responding to Flores's unreasonable actions.  As such, Scrivner recklessly, deliberately, and needlessly escalated a minor misdemeanor into an illegal seizure.

154.     Flores and Scrivner were shouting confusing commands at Bryan while at the same time shouting at each other, leading to even greater confusion.

155.     Flores used the police-created, escalated circumstances of the illegal seizure as the justification for his use of deadly force which led to shooting and killing Bryan.

156.     It is clearly established in the Tenth Circuit that an individual's constitutional rights are violated by unreasonable and illegal seizure.

157.     Flores and Scrivner are not entitled to qualified immunity based on their unlawful and illegal seizure.

158.     Bryan has been damaged because he was deprived of his life and his son is deprived of his father.

159.     No remedy exists to make Bryan whole.

160.     The conduct of Flores and Scrivner warrants the imposition of punitive damages as may be allowed by law.

## SECOND CAUSE OF ACTION

### ~ *Use of Excessive Force* ~

*Violation of Fourth and Fourteenth Amendments against Flores and Scrivner in their individual capacities. Cognizable under 42 U.S.C. §1983.*

161.     Plaintiffs incorporate all other paragraphs herein.

162.     Bryan was a pretrial detainee.

163.     A pretrial detainee must show only that the force used against him was objectively unreasonable in order to demonstrate that it was excessive, in violation of the Fourteenth Amendment's due process clause.

164.     The U.S. Supreme Court has held:

> The question before us is whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable. We conclude that the latter standard is the correct one.

*Kingsley v. Hendrickson*, 576 U.S. 389, 391-92 (2015) (italics in original).

165.      Flores, Scrivner and other Officers working for UPD were not entitled to punish Bryan, as he was a pretrial detainee.  The Tenth Circuit has held:

> Neither is this the end to what we know with certainty about the state of the law in 1997 regarding pretrial detainees.  By then the Supreme Court had held that the Fourteenth Amendment's guarantee of due process prohibits any punishment of those awaiting trial.  Punishment may be constitutionally acceptable for persons convicted of crimes – at least so long as it does not amount to "cruel and unusual" punishment as defined by *Estelle* and *Hudson*.  ***But punishment is never constitutionally permissible for presumptively innocent individuals awaiting trial.***

*Blackmon v. Sutton*, 734 F.3d 1237, 1241 (10th Cir. 2013) (multiple United States Supreme Court Decisions omitted; emphasis added).

166.      In addition, or in the alternative, Bryan was a citizen who had a Fourth Amendment right not to be arrested or taken into custody with excessive force.

167.      The forceful shooting during the arrest or detention constituted grossly excessive force in violation of the Fourth Amendment.

168.      Flores was operating in the course and scope of his employment as an officer and employee of the UPD, and under the color and guise of the laws of the State of Utah.

169.      At the time of Flores' use of deadly force against Bryan, as described herein, Flores was in no danger from Bryan whatsoever, nor was anyone in any danger from Bryan, since Bryan was unarmed and was standing with his hands up, complying with demands and giving himself up while under the control of Defendants.

170.     The deadly force Flores used against Bryan was completely unnecessary, dangerous, and extremely excessive.

171.     Flores used severe, reckless, excessive, unnecessary, improper, and deadly force against Bryan simply to punish Bryan for running away or not having his hands high enough.

172.     In 2020, it was well established by Utah Courts:

> The prohibition against unnecessary rigor clearly includes intentional physical abuse of persons under arrest or imprisoned. "[A]lthough police may use 'reasonable and necessary force' in making an arrest, the prohibition against unnecessary rigor does not allow police officers to commit assault and battery on a criminal suspect."

*Dexter v. Bosko*, 2008 UT 29, ¶16, 184 P.3d 592, 596 (Utah 2008) (citations omitted). Defendants' use of force in this case was punitive and constituted an unconstitutional death penalty.

173.     Any reasonable officer on the scene would have known that punitively killing a pretrial detainee by shooting a person who was compliant and at most had possibly ignored police demands to stop running, but was standing with his hands up, complying with demands in the process of giving up, constituted a serious, outrageous, and unnecessary use of excessive, potentially deadly, force.

174.     Such outrageous deadly force was violative of Bryan's rights guaranteed by the Fourth and Fourteenth Amendments to the U.S. Constitution.

175.     Flores' use of unreasonable, deadly, excessive, and dangerous force against Bryan directly and proximately caused his death and caused damages to the Estate.

176.     As a result, Bryan has been damaged as alleged herein, and is also entitled to §1983 attorney fees.

177.     Bryan had committed no serious crime.  At the time of Flores's foot pursuit, Bryan had, at most, 1) fled the scene of an accident; and, 2) not stopped when Officer Flores told him to do so.  Both are misdemeanors under Utah law.

178.     There was no evidence or information that might give Flores or Scrivner justification to suspect that Bryan was involved with the gun shots that had been reported earlier to UPD Dispatch.

179.     Flores recklessly, deliberately, and needlessly escalated the situation by chasing and cornering Bryan and pointing his handgun at him for no reason.  The Tenth Circuit has clearly established that:

> The reasonableness of [officers'] actions depends both on whether the officer were in danger at the precise moment that they used force and on whether [their] own reckless or deliberate conduct during the seizure unreasonable created the need to use such force.

*Bond v. City of Tahlequah, Oklahoma*, 981 F.3d 808, 822 (10th Cir. 2020) (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (brackets in original).  Through escalating the encounter with Bryan, Flores needlessly created, in his own subjective thinking, a justification for his ultimate use of deadly, unconstitutional force.

180.     Flores recklessly, deliberately, and needlessly escalated the encounter. Flores created, in his own subjective thinking, a justification for his ultimate use of deadly, unconstitutional force.

181.     At the precise moment Flores used deadly force, Bryan was seized and was, at most, a minor misdemeanant who may not have had his hands as high as Flores wanted.

182.     At the precise moment Flores used deadly force, Bryan had made no threats, either verbal or physical, toward the Officers at any time.

183.     At the precise moment Flores used deadly force, Bryan possessed no weapon in his hands or on his body.

184.     Even though he had allegedly been fleeing previously, at the precise moment Flores used deadly force, Bryan had stopped running and was not resisting either arrest or detention.  He had said to Flores, "Okay, Okay, I give up" and "Okay … calm down, okay … "

185.     Bryan's words, reported by both Flores and Scrivner, demonstrated his compliance with the Officers' commands and that he was not fleeing nor resisting.

186.     Flores's subjective views of the encounter are irrelevant in the analysis of whether his use of force was reasonable.  What is of importance is how an "objectively reasonable" officer would have addressed the situation.  Given the facts outlined herein, taken from Sim Gill's report, Flores's use of deadly force was not

objectively reasonable.  He violated Bryan's federal constitutional rights to be free from excessive force.

187.    Scrivner recklessly and deliberately contributed to the confusion and excessive force by following Flores's lead, without any further questioning, drawing his gun and yelling at Bryan.  Given the facts, Scrivner never saw any weapon in Bryan's hands.  He subjectively and unreasonably assumed that Bryan was an immediate threat *only* because Flores had his gun pointed at Bryan.  His actions encouraged Flores and led to his unreasonable use of deadly force.  Scrivner violated Bryan's federal constitutional rights to be free from excessive force.

188.    After the first shot, Bryan instantly fell to the ground.

189.    A reasonable officer on the scene would have known that once Bryan was on the ground, he was unable to take any further action.  Even if finding that the first shot could have been considered reasonable, which Mr. Gill did not do, Flores should have discontinued firing and not shot Bryan an additional five times.  Flores violated Bryan's federal constitutional rights to be free from excessive force.

190.    Flores had no reasonable justification for shooting Bryan the first time.  The additional five shots were even more unreasonable and egregious.  In *Fancher v. Barrientos,* 723 F.3d 1191 (10th Cir. 2013), the Tenth Circuit ruled that if the first shot subdues a suspect, further shots will lack probable cause and potentially violate a suspect's constitutional rights. After firing the first shot,

> "Barrientos … noticed Mr. Dominquez slump. This allowed him enough time … to recognize and react to the changed circumstances and cease firing his gun. Under these circumstances, we have no trouble concluding [Deputy] Barrientos lacked probable cause to believe [Mr.] Dominguez posed a threat of serious harm to Deputy Barrientos or others at the time he fired shots two through seven."

*Fancher,* 723 F.3d at 1201.

191.    It was clearly established and should have been well known to a trained, police officer that an individual's constitutional rights are violated by the unreasonable use of deadly force.

192.    Flores is not entitled to qualified immunity based on his unlawful and illegal use of excessive force.

193.    Bryan's Estate has been damaged as alleged in Claim #1, which is incorporated herein by reference.

194.    The conduct of Flores warrants the imposition of punitive damages as may be allowed by law.

## THIRD CAUSE OF ACTION

### ~ *Failure to Train and/or Supervise* ~

*Against Unified Police Department, as a Special Service District, relating to defective policies, customs or practices; against Flores and Scrivner through UPD, in their official capacity as officers of the UPD.  Cognizable under 42 U.S.C. §1983.*

195.     Plaintiffs incorporate all other paragraphs herein.

196.     On March 21, 2020, as described above, UPD, through Flores and Scrivner, perpetrated a flagrant, outrageous, unreasonable and conscience shocking seizure of Bryan Pena Valencia.

197.     On March 21, 2020, as described above, UPD, through Flores, perpetrated an outrageous, unreasonable and conscience shocking use of deadly force in the shooting death of Bryan Pena Valencia.

198.     On March 21, 2020, as described above, UPD, through Scrivner, contributed to the outrageous, unreasonable and conscience shocking use of deadly force in the shooting death of Bryan Pena Valencia.

199.     There was no reason for the Officers to either seize or use force, much less excessive force, against Bryan Valencia.

200.     UPD had a duty to fully and adequately train and supervise their Officers to adhere to the proscriptions against unreasonable, illegal seizures and against the unreasonable, illegal use of deadly force in accordance with clearly established law

pursuant to the Fourth and Fourteenth Amendments to the United States Constitution as well as Article I, Sections 7, 9 and 14 of the Utah Constitution.

201.    UPD knowingly and recklessly failed to adequately train and/or supervise its Officers to adhere to the proscriptions against illegal and unreasonable seizures and use of deadly force in accordance with the clearly established law pursuant to the Fourth and Fourteenth Amendments as well as Article I, Sections 7, 9 and 14 of the Utah Constitution.

202.    The failure of UPD to train and to supervise its Officers to adhere to these proscriptions demonstrates a reckless indifference to the rights of the people they should be protecting, including Bryan Valencia.

203.    The effect of this indifference was to expose individuals to unreasonable seizures and illegal deadly force, as occurred in this encounter.

204.    The inaction of UPD in applying punishment or any other consequence to the bad behavior of Flores and Scrivner, demonstrates tacit approval to other employees that such behavior is condoned and approved.

205.    The failure of UPD to fully and adequately train and supervise its Officers and/or to enforce its policies, procedures, and/or protocols, if they existed, proximately caused Bryan's damages.

206.    The conduct of Flores and Scrivner warrants the imposition of punitive damages as may be allowed by law.

207.     Bryan has been damaged as alleged in Claim 1, which damages are incorporated herein by reference.

208.     Plaintiff is also entitled to attorney fees under §1988.

## FOURTH CAUSE OF ACTION

### ~ *Outrageous and Conscience Shocking Conduct* ~

*Against Flores and Scrivner for Violations of the Fourteenth Amendment to the Constitution of the United States.  Cognizable under 42 U.S.C. §1983.*

209.     Plaintiffs incorporate all other paragraphs herein.

210.     The actions of Flores in shooting Bryan were outrageous and conscience shocking for at least the following reasons:

a.     Bryan was unarmed.

b.     Bryan had committed no crime, or at most, an extremely minor infraction or misdemeanor.

c.     No officer or other person was threatened or at risk of harm due to Bryan's actions.

d.     At the precise moment of the first shot, Bryan was not fleeing or escaping.  Any prior attempt to flee had been abandoned or subverted.

e.     Bryan tried to surrender and had his hands up when Officer Flores fired the first shot.

       **f.**     Bryan make it very clear to Flores and Scrivner that he had given up and was not a threat.

       **g.**     Bryan held his hands up high, so it was obvious that he was not reaching for anything in his clothing.

       **h.**     Flores fired at least another five shots into Bryan while he was on the ground, after having fallen due to the first shot.  None of the shots were justified under the law.

       **i.**     There was no "immediately connected conduct" by Bryan which justified the shooting.

       **j.**     Flores failed to adjust his response to changed or evolved circumstances.

     **211.**     Bryan uttered no threats or threatening statements, made no threatening movements, never used or raised a weapon, and never otherwise moved in an aggressive manner.

     **212.**     The actions of Defendants in shooting Bryan as set forth herein were outrageous and conscience shocking.

     **213.**     The actions of Flores are outrageous and conscience shocking. Said actions, as set forth herein, constitute a substantive due process violation of the Fourteenth Amendment in that Defendants' actions "demonstrate[d] a degree of outrageousness and

magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig v. Harder,* 64 F.3d 567, 574 (10th Cir. 1995).

214.    To show a defendant's conduct is conscience shocking, a plaintiff must prove a government actor arbitrarily abused his authority or "employ[ed] it as an instrument of oppression." *Williams v. Barney,* 519 F.3d 1216, 1220 (10th Cir. 2008) (internal punctuation omitted).

215.    The Tenth Circuit has held that "[o]utrageous government conduct during a criminal investigation may constitute a violation of substantive due process rights." *Romero v. United States,* 658 Fed.Appx. 376 (10th Cir. 2016) (citing *United States v. Mosley,* 965 F.2d 906, 908-09 (10th Cir. 1992) (internal punctuation omitted).

216.    Such outrageous conduct occurred in the interaction and shooting of Bryan by Defendant Flores, with the assistance or nonfeasance of Scrivner.

217.    The actions of Flores and Scrivner violated Bryan's Fourteenth Amendment right to due process of law.

218.    As a result of the actions of Flores and Scrivner, Bryan was killed, or essentially executed without a trial.

219.    The Estate of Bryan Pena Valencia has been damaged by these actions as set forth herein.

220.    These damages include leaving Bryan's minor child as an orphan.

221.    Plaintiffs have been damaged as set forth herein.

222.     Plaintiffs are entitled to attorney fees under §1988.

### **FIFTH CAUSE OF ACTION**

### ~ ***State Constitutional Claims*** ~

*Violation of the Utah Constitution against Flores and Scrivner in their individual capacities.  Cognizable under Article I, Sections 7, 9 and 14 of the Utah Constitution.*

223.     Plaintiffs incorporate all other paragraphs herein.

224.     Article I of the Utah Constitution, similar to the U.S. Constitution, provides protection of basic rights for its citizens, as follows:

   a.     Against illegal seizure – Section 7

   b.     Against excessive force and unnecessary rigor – Section 9

   c.     Against denial of due process – Section 14

225.     Flores and Scrivner flagrantly violated the Utah Constitutional rights of Bryan Valencia when they illegally seized him.

226.     Flores flagrantly violated the Utah Constitutional rights of Bryan Valencia when he used excessive force in unreasonably shooting him six times, causing his death.

227.     Flores and Scrivner, as explained above, flagrantly violated the Utah Constitutional rights of Bryan Valencia by denying him Fourteenth Amendment due process rights by their outrageous, conscious shocking conduct.

**228.**     Bryan has been damaged as set forth herein, which is incorporated herein by reference.

**229.**     No remedy for Bryan's illegal seizure and unconstitutional death exists.

**230.**     The conduct of Flores and Scrivner warrants the imposition of punitive damages as may be allowed by law.

### SIXTH CAUSE OF ACTION

*~ Failure to Intervene ~*

**Against Officer Scrivner and Does in their
Individual Capacities**

**~ Cognizable Under 42 U.S.C. §1983 ~**

**231.**     Plaintiffs incorporate all other paragraphs herein.

**232.**     Officer Scrivner had a duty to intervene to prevent a violation of Bryan's constitutional rights by his partner, Officer Flores.

**233.**     Officer Scrivner was obligated to take reasonable steps to protect Bryan from Flores' illegal use of deadly force, often referred to as a "duty to intervene."

**234.**     Officer Scrivner failed to take any steps at all to protect Bryan from Flores' deadly force.

235.     "It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Mascorro v. Billings,* 656 F.3d 1198, 1204, fn. 5 (10th Cir. 2011).

236.     Plaintiffs have been damaged as set forth herein.

237.     Plaintiffs are entitled to attorney fees under §1988.

## JURY DEMAND

Plaintiffs demand a trial by jury on all Causes of Action included herein.

## REQUESTS FOR RELIEF

**WHEREFORE,** Plaintiffs pray judgment against Defendants as follows:

1.     For general and compensatory damages in an amount to be determined at trial, but not less than $2,000,000.

2.     For special damages as are shown at trial, but not less than $500,000 to date.

3.     For punitive damages against Defendants as may be allowed by law and as are shown at trial.

**4.**     For pre-judgment interest on the damages assessed by the verdict of the jury, as allowed by law.

**5.**     For Plaintiffs' costs and reasonable attorney fees incurred herein, pursuant to 42 U.S.C. §1988; and

**6.**     For such other and further relief as the Court deems just and proper.

DATED this 4th day of May 2021.

**SYKES McALLISTER LAW OFFICES, PLLC**

/s/  Robert B. Sykes                            
Robert B. Sykes, Esq.

/s/  C. Peter Sorensen                         
C. Peter Sorensen, Esq.

/s/  Christina D. Isom                         
Christina D. Isom, Esq.